IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| AARON D. BROWN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:08-CV-2251-O-BH |
| | § | |
| ERIC K. SHINSEKI, Secretary of the | § | |
| Department of Veterans Affairs, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to Special Order No. 3-251, this case was referred for pretrial management, including the determination of non-dispositive motions and the issuance of findings, conclusions, and recommendation on dispositive motions. Before the Court is *Defendant's Motion for Summary Judgment*, filed January 15, 2010 (doc.41). Based on the relevant filings, evidence, and applicable law, Defendant's motion should be **GRANTED**.

### I.  BACKGROUND[1]

Plaintiff Aaron D. Brown is a legally blind former employee of the Dallas Veteran Affairs Medical Center ("VA"). (App. pp. 12,34, 11-116, 119). The VA hired her full-time in 1978, and she began serving as a medical technician in its Pathology and Laboratory Medicine Service in 1983. (App. pp. 13-15, 17-20, 124, 131). Her principal responsibility as a medical technician was

---

[1] The background is taken from the appendix in support of Defendant's motion for summary judgment ("App."). Although Defendant submitted an appendix in support of his reply, he did not seek leave to file new evidence. Because allowing the evidence would deprive Plaintiff of a meaningful opportunity to respond, the reply appendix has not been considered. *See Spring Industries, Inc. v. American Motorists Ins. Co.*, 137 F.R.D. 238, 239 (N.D. Tex. 1991) (Fitzwater, J.) ("where a movant has injected new evidentiary materials in a reply without affording the nonmovant an opportunity for further response, the court still retains the discretion to decline to consider them").

phlebotomy, or drawing blood from patients. (App. pp. 22-23, 135-37). She was required to have adequate vision in order to safely perform phlebotomy. (App. p. 141). She was also required to wear gloves and not touch the needle when performing phlebotomy. (App. pp 24-26).

In 1987, Plaintiff was diagnosed with a progressive eye disease called retinitis pigmentosa. (App. p. 35). She did not experience any significant vision problems until February of 2006, when she began having trouble using her computer, seeing her patient's veins, and reading labels on blood specimens. (App. pp. 35, 36-39, 42, 51). Her vision problems were noticeable at work because she walked into colleagues on several occasions, and once had to be guided out of the building when the lights went out. (App. pp. at 153-55). Because she had trouble seeing the veins while performing phlebotomy, she started using a partially ungloved hand to feel and locate them. (App. pp. at 39-42). She also made several unheeded requests to her supervisors for thinner gloves. (App. pp. 39-40). Her colleagues tried to help her by reading the labels, and by identifying the colors of the tubes that she worked on. (App. pp.151-53).

In March of 2006, an eye specialist saw Plaintiff regarding her vision problems, finding that the corrected vision in each eye was 20/400 and that she had "already been certified as legally blind." (App. pp. 35, 44, 114, 159, 161). That same month, Plaintiff provided her immediate supervisor, Marsha Hill, with a medical report finding her legally blind. (App. pp. 26, 44-45). This was the first time that Plaintiff had informed anyone at the VA of her eye condition. (App. p. 36). During that same month, Plaintiff joined the Texas Commission for the Blind/Texas Department of Assistive and Rehabilitive Service Division for Blind Services ("DARS"), where she was assigned Janet Cuevas as a counselor. (App. pp. 46-48). Ms. Cuevas provided Plaintiff with a pair of magnifiers to help see the veins while drawing blood. (App. p. 58). Plaintiff tried drawing blood

with one of the magnifiers clipped onto her glasses but abandoned the technique after two weeks because it made her feel dizzy and nauseated. (App. pp. at 58-61).

With the help of DARS, Plaintiff visited San Antonio, Texas, in June 2006, to identify adaptive equipment that she believed would help with her job. (App. pp. at 46-50, 57, 144, 147). She selected a handheld scanner to scan over labels, a special computer monitor that magnified objects such as newspapers and books, a software program named JAWS that made a computer speak, and a software program named MAGic that magnified the print on a computer screen. (App. pp. 49-50). Upon her return, Plaintiff met with her immediate supervisor and her administrative officer, Ruth Kirkland, and requested that the VA purchase her selected equipment. (App. pp. 27, 45, 222). Kirkland stated that "it shouldn't be a problem" for the VA to provide that equipment. (App. p. 66).

In October 2006, Kirkland met with the VA's Reasonable Accommodation Committee to discuss the requested equipment, but the Committee concluded that the equipment would not allow Plaintiff to perform phlebotomy safely. (App. pp 223, 229). Shortly thereafter, a floor supervisor notified Hill that Plaintiff was using a partially ungloved hand to locate veins against the VA's safety policy. (App. pp. 42, 62, 142-43, 162, 188-89, 195-216). Plaintiff had not told Hill of the unsafe practice for fear that she would not agree with it. (App. pp. 24-26, 40-41, 143, 162, 172-85). On October 17, 2006, Hill and a safety officer removed Plaintiff from her phlebotomy duties, citing "considerable patient/employee safety concerns." (App. pp. 63-64, 162, 233). They also removed her from a part-time contract phlebotomy position with a company named Swanco-Collecto that the VA had arranged for her at various drug rehabilitation facilities. (App. pp. 28-33, 64, 75, 145, 149, 163, 244-46). Plaintiff had used the ungloved technique at those facilities even though their safety

3

policies were the same as the VA's. (App. at 76-77).

Plaintiff was temporarily reassigned, with no loss of pay or change in title, to courier functions, such as transporting blood samples to Client Services. (App. pp. 16, 69-71, 239, 242-43). A VA memorandum noted that Plaintiff's reassignment was temporary until a decision could be made about her future duties and position based upon her medical diagnosis and any necessary accommodations. (App. p. 248). Plaintiff's new courier duties were minor responsibilities for a medical technician, but she had trouble performing them because specimen labels were difficult for her to read. (App. pp. 73-74). Afraid of losing her job, Plaintiff did not tell her supervisors about the difficulties and continued to rely on colleagues for help. (App. p. 75).

Meanwhile, the VA continued to consider Plaintiff's request for adaptive equipment. On October 19, 2006, Kirkland sent Plaintiff an email message containing a link to a federal program called Computer/Electronic Accommodations Program ("CAP") that provided free assistive technology and services to federal employees and asking Plaintiff to inform her if she found any equipment comparable to what she had selected in San Antonio. (App. pp. 223, 249). She explained that the VA needed to see what was available through CAP before committing to buy anything else. (App. p. 249). In December 2006, Kirkland ran into Plaintiff and learned that she had not read the email. (App. p. 223). The two then reviewed the CAP website together, and Plaintiff selected the appropriate equipment. (App. pp. 79-81, 223). On December 12, 2006, Kirkland submitted Plaintiff's order to an Office of Worker's Compensation programs specialist. (App. p. 223).

That same day, the chief of Pathology and Laboratory Medicine Service sent a memorandum to the chair of the VA's Resource Management Committee, requesting approval to reassign Plaintiff to an existing vacant position for a GS-4 program clerk in the Client Services Unit, with an updated

4

position that included responsibilities other than phlebotomy. (App. p. 251). The committee approved the request if the position were filled at a GS-4 level. *Id.* However, Plaintiff was a GS-5, step 10, at the time, which was the highest step within the grade and higher-paying than a GS-4 position at any step. (App. pp. 15-16, 243, 252). In January 2007, Plaintiff's salary increased from $38,124 to $39,085. (App. pp. 67-68).

In February 2007, Hill and Kirkland proposed that Plaintiff maintain her GS-5 status in a new program support clerk position. (App. pp. 73, 223, 254-58, 260). They created the position as an accommodation for her, and attempted to include as many duties as possible in the position description so that Plaintiff could maintain her grade level. (App. pp. 223-24). Human Resources however, classified the position at the GS-4 level and expressed concerns that the major duties in the position description were at the GS-4 level. (App. pp. 224, 261). On April 2006, Kirkland sent Human Resources an email message with a revised position description. (App. pp. 261, 263-66).

At some point in 2007, Kirkland "learned from someone in the CAP program that funding for the program was not always sufficient to meet demand." (App. p. 224). Kirkland decided to look into other resources. *Id.* On August 15, 2007, Plaintiff suffered a panic attack while attempting to complete a standardized test that VA employees were required to take. (App. pp. 82-83, 148, 152, 171). She had requested but had not been assigned anyone to help her take the test. (App. pp. 43, 83-84, 148). Plaintiff learned that day or the next that the VA had excused her from the test requirement. (App. pp. 84-85).

On August 16, 2007, Plaintiff met Kirkland and her second-line supervisor, Sheryl Poyer, in the presence of a union representative, to determine whether the VA had ordered the requested equipment. (App. pp. 27, 90-91, 149, 224, 259, 271). Kirkland stated that she would order the

5

equipment as soon as possible. (App. pp. 224, 271). The union representative responded that Plaintiff would need the equipment within two weeks. (App. pp. 91-92, 149-50). Later that day, Kirkland sent an email message to the VA's associate director to inquire whether the VA could buy the requested equipment with its own funds from a website called "Access Ingenuity." (App. p. 271). She identified the projected cost of the equipment as $3,759, and noted that similar equipment was available at no cost through the CAP program, but that orders were often delayed due to funding problems. (App. pp. 272-73). That same day, Hill sent a memorandum to the chair of the Resource Management Committee, requesting approval to offer Plaintiff a position as a GS-4 program clerk for two years at her GS-5, step 10, salary. (App. pp. 187, 274). The request for pay retention was denied. (App. pp. 274-75).

In the meantime, Plaintiff contacted an EEO counselor alleging disability discrimination and failure to accommodate. (App. pp. 272-73). She took sick leave on August 20 and 21, 2007. (App. pp. 85, 145). On August, 21, 2007, Hill offered her the GS-4 position. (App. pp. 77, 98, 276). On August 22, 2007, Plaintiff stopped going to work "due to her emotional breakdown and the unbearable stress she [felt] while at work," even though a doctor's note stated that she could return to work on August 22, 2007. (App. pp. 98-99-248, 281-83). On August 23, 2007, Plaintiff filed an application for Social Security benefits and Supplementary Security Income. (App. pp. 88, 284, 292, 301-03). On August 28, 2007, the VA sent Plaintiff a letter denying her request for leave without pay and instructing her to return to work. (App. p. 304). The letter explained that her doctor's note indicated she was "unable to read' but not unable to work and that the VA had work for her that did not require reading. (App. pp. 304, 115-16, 305).

On August 29, 2007, an eye specialist Dr. Rafael Ufret-Vincenty examined Plaintiff. (App.

pp. 113-14, 306). He noted that Plaintiff was undergoing testing and that he suspected she was legally blind and would need special accommodations at work. (App. p. 306). He suggested waiting for the test results before she returned to work. *Id.* Shortly thereafter, Kirkland, who had heard the word "legally blind" for the first time in connection with Plaintiff, decided to suspend the VA's order for the adaptive software until Plaintiff returned to work and more was known about whether the accommodations would help her. (App. pp. 224, 308-09, 311). One piece of equipment had by then already arrived at the VA. (App. pp. 91-92, 150, 163, 225, 268, 270, 310-12).

On September 5, 2007, Dr. Ufret-Vincenty wrote that Plaintiff was still undergoing testing to determine if visual aids would help her improve her visual functioning. (App. pp. 93, 313). On September 17, 2007, he stated that Plaintiff was legally blind, and "even with special accommodations her visual acuity and field of vision will probably limit her ability to function in most areas of work...not only dependent on reading but also any other areas that would require her to move quickly, use depth perception, or see in dim illumination." (App. pp. 93, 113-14). On October 2, 2007, a VA human resources specialist concluded that "the medical evidence presented to the agency shows that the accommodation is not possible due to severity of medical condition and the physical requirements of the position." (App. pp. 315-16).

On October 19, 2007, Plaintiff, Hill, and Kirkland attended a mediation where they discussed adding more complex responsibilities to the GS-4 position description in order to resubmit it to Human Resources for another classification. (App. pp. 102-104, 225, 248, 317-18). Plaintiff ended the mediation stating that she did not want to pursue those changes and would look into retirement instead. (App. pp. 105, 225, 248). She applied for disability retirement and was approved. (App. pp. 87, 150, 327-34, 338). The VA later added more complex responsibilities to the GS-4 position

7

description, but Human Resources continued to classify it at the GS-4 level. (App. pp. 225, 339-44). The VA held open both Plaintiff's GS-5 phlebotomist position and the new GS-4 position as late as December 20, 2007. (App. pp. 225, 248, 311).

On November 19, 2007, Plaintiff filed a formal complaint of discrimination with the VA. (App. pp. 267, 345-46). She claimed that the VA had not provided her the requested accommodation devices and told her that the only job she could get was a downgraded GS-4 position. (App. pp. 105-06, 267, 273). The agency's Office of Resolution Management dismissed the second claim on the ground that the lower-graded position was merely a proposal, and Plaintiff was not reassigned or demoted. (App. pp. 276-77). On September 30, 2008, the VA issued a final decision with respect to Plaintiff's first claim stating that Plaintiff had established a prima facie case of discrimination. (App. p. 363). The decision concluded, however, that there was no accommodation that would allow Plaintiff to perform a medical technician's principal duty and draw blood safely. *Id.* The decision also concluded that the agency took reasonable steps to accommodate Plaintiff's disability, and that it did not unreasonably delay ordering the adaptive equipment. (App. pp. 364-365).

Plaintiff did not appeal the VA's decision but filed a timely *pro se* complaint in this Court on December 22, 2008. She essentially complains that the VA removed her from performing phlebotomy without providing her with the requested adaptive equipment, that it tried to demote her to a GS-4 position, and that this conduct caused her distress. (*See* doc. 1; App. pp. 143-45). On January 15, 2010, Defendant moved for summary judgment with respect to all of Plaintiff's claims. (Mot. at 5). Plaintiff filed a response on February 4, 2010. On February 19, 2010, Defendant filed a reply, and the motion is now ripe for consideration.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id*. The movant makes a showing that there is no genuine issue of material fact by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The pleadings, discovery and disclosure materials on file, and affidavits, if any, must demonstrate that no genuine issue of material fact exists. Fed. R. Civ. P. 56(c).

Once the movant makes this showing, the non-movant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324. To carry this burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-movant must show that the evidence is sufficient to support a resolution of the factual issue in his favor. *Anderson*, 477 U.S. at 249.

While all of the evidence must be viewed in a light most favorable to the motion's opponent, *id*. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)), neither conclusory allegations nor unsubstantiated assertions will satisfy the non-movant's summary judgment burden, *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc); *Topalian v. Ehrman*, 954

F.2d 1125, 1131 (5th Cir. 1992). Summary judgment in favor of the movant is proper if, after adequate time for discovery, the motion's opponent fails to establish the existence of an element essential to his case and as to which he will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

Generally, the courts liberally construe the pleadings of a *pro se* plaintiff. *See*, *e.g.*, *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (per curiam); *Miller v. Stanmore*, 636 F.2d 986, 988 (5th Cir. 1981); *Martin v. United States Post Office*, 752 F. Supp. 213, 218 (N.D. Tex. 1990). However, the courts have no obligation under Fed. R. Civ. P. 56 "to sift through the record in search of evidence to support a party's opposition to summary judgment." *Adams v. Travelers Indem. Co.*, 465 F.3d 156, 164 (5th Cir. 2006) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)). Instead, a party opposing summary judgment must "identify specific evidence in the record" that supports the challenged claims and "articulate the precise manner in which that evidence supports [a challenged] claim." *Ragas*, 136 F.3d at 458 (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)).

### III.   DISABILITY-BASED DISCRIMINATION CLAIM

Defendant moves for summary judgment on Plaintiff's disability discrimination claim under the Rehabilitation Act. (Mot. at 18-27).

The Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, provides "the exclusive remedy for a federal employee alleging disability-based discrimination." *Dark v. Potter*, 293 F. App'x. 254, 258 (5th Cir. 2008). Discrimination claims brought under the Rehabilitation Act are governed by the standards applicable under Title I of the Americans with Disabilities Act ("ADA"). *See* 29 U.S.C. § 794(d); *Carter v. Ridge*, 255 F. App'x. 826, 829 (5th Cir. 2007). To establish discrimination under the

10

Rehabilitation Act, an employee must demonstrate that (1) she has a disability, (2) she was qualified for her job; (3) she worked for a program or activity receiving federal financial assistance; and (4) an adverse employment decision was made solely by reason of her disability. *See* 29 U.S.C. § 794(a); *McKay v. Johanns*, 265 F. App'x 267, 268 (5th Cir. 2008)(citing *Hileman v. City of Dallas, Tex.*, 115 F.3d 352, 353 (5th Cir. 1997)). The burden of proof for each of these elements lies with the employee. *Chandler v. City of Dallas*, 2 F.3d 1385, 1390 (5th Cir. 1993). An employer is required to show reasonable accommodations to the known physical or mental limitations of the employee only after the employee meets all of the elements of her discrimination claim. *See Burch v. City of Nacogdoches*, 174 F.3d 615.

**A.     Qualified**

Defendant first asserts that Plaintiff was not qualified because she could not perform the essential functions of her full-time phlebotomy position with the VA or her part-time contract position with Swanco-Collecto, with or without reasonable accommodation. (Mot. at 18-20).

In order to be qualified, an employee must show that she "can perform the essential functions of the employment position" that she holds or desires "with or without reasonable accommodation." 42 U.S.C. § 12111(8). The Fifth Circuit has adopted a two-part test to determine whether an employee is qualified. *Chandler*, 2 F.3d at1393. First, a court must determine whether the employee "could perform the essential functions of the job i.e. functions that bear more than a marginal relationship to the job at issue." *Id.* Second, if the court concludes that she cannot perform the essential functions of the job, it "must determine whether any reasonable accommodation by the employer would enable [her] to perform those functions." *Id.* at 1393-94.

Defendant provides undisputed evidence that the essential functions of Plaintiff's

11

phlebotomist position at the VA and her part-time contract phlebotomy position involved drawing blood safely. (Mot. at 18-19, citing App. pp. 22-26). With worsening vision, Plaintiff resorted to drawing blood with a partially ungloved hand against VA safety policy. (Mot. at 19, citing App. pp. 24-26, 38-39, 42, 59, 62, 172-85, 188-89, 195-216). Plaintiff admitted that using magnifiers made her feel dizzy and nauseated, that neither JAWS nor MAGic would help her draw blood, and that even though she thought a handheld scanner and special computer might help her draw blood, noone at DARS or the VA had authorized using the equipment for that purpose. (Mot. at 19, citing App. pp. 51-56, 58-60). Dr. Ufret-Vincenty opined that even with special accommodations, Plaintiff would probably be limited in her ability to function in most areas of work, including areas dependent on reading or requiring her "to move quickly, use depth perception, or see in dim illumination." (Mot. at 19-20, citing App. pp. 93, 113-14). He also concluded that Plaintiff was permanently disabled and could not be employed in any occupation. (Mot. at 20, citing App. pp. 114, 324-26).

Defendant has met his summary judgment burden by identifying evidence in the record that shows that Plaintiff was not qualified to perform phlebotomy safely, with or without reasonable accommodations. *See Celotex Corp.*, 477 U.S. at 323. The burden now shifts to Plaintiff to direct the Court's attention to evidence in the record establishing a genuine issue of material fact that she was able to perform phlebotomy. *Celotex Corp.*, 477 U.S. at 324. Plaintiff must "go beyond the pleadings" and by her own affidavits, depositions, answers to interrogatories, and admissions on file point out "specific facts" to show that there is a genuine issue of fact. *Id.*

Plaintiff argues that the issue is not whether she could phlebotomize, but whether she was reasonably accommodated in Client Services. (Resp. at 2). However, Plaintiff was removed from phlebotomy and only temporarily assigned courier duties in Client Services while retaining her GS-5

step 10 salary; the real job at issue is her GS-5 medical technician position. Plaintiff also argues that her supervisors did not provide her with thinner gloves. (Resp. at 3). However, she does not identify any evidence showing that thinner gloves, or any other accommodation, would have enabled her to perform the essential functions of her medical technician job. Plaintiff therefore has not established a genuine issue of material fact concerning an element of her disability discrimination claim, and Defendant is entitled to summary judgment on this claim. *See Celotex Corp.*, 477 U.S. at 322-23; *Ragas*, 136 F.3d at 458.

**B.     Adverse Action**

Defendant next contends that the VA did not take any adverse action against Plaintiff when it removed her from phlebotomy. (Mot. at 21-22). He claims that Plaintiff's duties were only temporarily restructured with no loss of pay or change in title from phlebotomy to courier functions, until a decision could be reached about her future duties and position based upon her diagnosis and any necessary accommodations. (Mot. at 22, citing App. pp. 16, 69-71, 239, 242-43, 248).

An adverse employment action in the discrimination context consists of ultimate employment decisions such as hiring, firing, promoting, demoting, compensating, and granting leave. *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004).[2] Since the VA temporarily restructured her GS-5 position without any loss of pay or change in title until a permanent solution could be reached, and Plaintiff voluntarily resigned from her position, the VA did not take an adverse action against

---

[2] While the Fifth Circuit has consistently limited adverse employment action in the Title VII context to acts which affect compensation, duties, and benefits, one case has questioned whether this formulation comports with the Supreme Court's standard for Title VII cases in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). *See McKay*, 265 F.App'x at 268-69. In *Burlington*, the Supreme Court held that the words in the substantive provisions of Title VII, such as "hire," "discharge," "compensation", and "terms, conditions, or privileges of employment" limit the scope of that provision to actions that affect employment or alter the conditions of the workplace. *See Burlington*, 548 U.S. at 62. The Fifth Circuit has concluded that limitations similar to those in Title VII cases "apply to the similarly worded provisions of the ADA and by extension to the Rehabilitation Act." *See McKay*, 265 F.App'x at 269.

13

her.[3] *See Handy*, 118 F. App'x at 855; *Pegram* , 361 F.3d at 283 (a lateral transfer with no decrease in pay or benefits is not an adverse action); *Hyde v. K.B. Home Inc.*, 2009 WL 4269800, at *3 (11th Cir. Dec. 1, 2009) (a temporary reassignment is not an adverse action if the employee's job title and pay do not change, she is not transferred or demoted, and her job duties are restructured for a reason). Under current Fifth Circuit law, Defendant has met his summary judgment burden.

The burden now shifts to Plaintiff to identify evidence in the record supporting her disability discrimination claim, and articulate the precise manner in which that evidence supports her claim. *Ragas*, 136 F.3d at 458. Plaintiff makes a conclusory allegation in her response that she was demoted but does not articulate how she was demoted, or identify any evidence to support her demotion claim. (Resp. at 3). Because there is no genuine issue of material fact that the VA did not take an adverse action against Plaintiff, Defendant is entitled to summary judgment on her disability discrimination claim on this basis. *See Ragas*, 136 F.3d at 458; *Celotex Corp.*, 477 U.S. at 322-23.

## C. **Reasonable Accommodations**

Defendant contends that the VA still provided Plaintiff with reasonable accommodation even though it was not required to do so since she cannot meet all the elements of her disability discrimination claim. (Mot. at 18, 23-27); *see also Nacogdoches*, 174 F.3d at 619.

The Rehabilitation Act requires an agency "to make reasonable accommodation to the known physical or mental limitations" of a qualified employee "if the accommodation would not impose an undue hardship on the operations of its program." 29 C.F.R. § 1614.203(c)(1). Reasonable accommodation may include job restructuring. 29 C.F.R. § 1614.203(c)(2); *see also* 42 U.S.C. §

---

[3] Defendant concedes that Plaintiff was permanently discharged from her part-time contract phlebotomy position with Swanco-Collecto but argues that she was not qualified to perform phlebotomy, the core function of that position. (Mot. at 22-23).

14

12111(9)(B); *Allen v. Rapides Parish Sch. Bd.*, 204 F.3d 619, 622 (5th Cir. 2000). However, an employer need not alter the essential functions of a job in order to accommodate a disabled employee. 29 C.F.R § 1630.2(o) app. Reassignment to a vacant position is also a form of reasonable accommodation. 42 U.S.C. § 12111(9)(B); *see also Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 (5th Cir. 1997). Reassignment to a lower graded position is also a reasonable accommodation "if there are no accommodations that would enable the employee to remain in the current position and there are no vacant equivalent positions for which the individual is qualified with or without reasonable accommodations." 29 C.F.R § 1630.2(o) app.

Defendant asserts that pending a full evaluation of her condition, Plaintiff's supervisors restructured her job to eliminate phlebotomy while retaining her GS-5 position and salary. (Mot. at 24; App. pp. 16, 69-71, 239, 242-43). They also attempted to create a new GS-5 position for her without phlebotomy responsibilities even though the Rehabilitation Act contemplates reassignment only to a vacant position. (Mot. at 26; App. pp. 73, 223, 254-58, 260). They requested approval to offer her a GS-4 program clerk position at her GS-5, step 10 salary for two years, but the pay retention was denied. (Mot. at 26, citing App. pp. 187, 274-75). Hill offered her a GS-4 position on August, 21, 2007. (App. pp. 77, 98, 276). The supervisors and the administrative officer also took reasonable steps to obtain the adaptive equipment, even though it was not clear at first whether the equipment would help with her phlebotomy position. (Mot. at 24-25, citing App. pp. 93, 113-15, 313-16). They waived a mandatory computerized testing requirement for her. (Mot. at 27, citing App. pp. 84-85); 42 U.S.C. §12111(9)(B) (adjustment or modifications of examinations are also a form of accommodation). Based on this evidence, Defendant has met his summary judgment burden to show that the VA provided reasonable accommodation to Plaintiff.

Plaintiff must now identify evidence in the record showing that the VA did not provide reasonable accommodation for her. Plaintiff makes conclusory allegations that she was not offered any assistance by management and that her supervisors did not monitor her equipment situation or advise her of its status. (Resp. at 3, 5). However, she identifies no evidence to contradict Defendant's competent summary judgment evidence. *See Ragas*, 136 F.3d at 458. Defendant is entitled to summary judgment on Plaintiff's discrimination claim on this basis as well.

## IV.  DISPARATE TREATMENT

Defendant also moves for summary judgment on any disparate treatment claim construable from Plaintiff's *pro se* pleadings . (Mot. at 27-30).

To establish a claim of disparate treatment under the ADA, and by extension the Rehabilitation Act, an employee must establish a prima facie case that (1) she has a disability; (2) she was qualified for her position; (3) she was subject to an adverse employment action; and (4) she was treated less favorably than non-disabled employees. *See Seaman v. CSPH, Inc.*, 179 F.3d 297, 300 (5th Cir. 199). "The employer then must show a legitimate non-discriminatory reason for its action. The employee ultimately bears the burden of showing that the employer's actions were motivated by considerations prohibited by the statute." *Id.*

Defendant correctly points out, for reasons stated earlier, that Plaintiff has not met the second and third prong of her prima facie case for disparate treatment. (Mot. at 28). Since Plaintiff did not identify evidence of record to establish a prima facie case, Defendant is entitled to summary judgment on any disparate impact claim. *See Ragas*, 136 F.3d at 458.

## V.  CONSTRUCTIVE DISCHARGE

Defendant also moves for summary judgment on any constructive discharge claim that can

16

be construed from Plaintiff's complaint. (Mot. at 30-31).

In order to prove constructive discharge, an employee must show that her working conditions were so intolerable that a reasonable person in her position would feel compelled to resign. *See Handy v. Brownlee*, 118 F. App'x. 850, 855 (5th Cir. 2004)(citing *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004); *Tyler v. Union Oil of Claifornia*, 304 F.3d 379, 394 (5th Cir. 2002). A court considers the following factors, singly or in combination, to determine whether a reasonable employee would have felt compelled to resign: "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less than the employee's former status." *See Tyler*, 304 F.3d at 394; *Hockman v. Westwood Commc'ns, L.L.C.*, 407 F.3d 317, 331 (5th Cir. 2004). The burden is on the employee to prove constructive discharge. *See Boze v. Branstetter*, 912 F.2d 801, 804 (5th Cir. 1990).

Defendant argues that there is nothing in the record to suggest constructive discharge. (Mot. at 31). As discussed earlier, the VA did not demote Plaintiff but tried to accommodate her disability when it temporarily reassigned her courier functions without changing her pay or title. Any efforts to create a new position for her were also meant to accommodate her. There is certainly no suggestion that Plaintiff's temporary duties were menial or degrading. There is no evidence of badgering, harassment, or humiliation calculated to encourage her resignation. Instead, the evidence shows that her supervisors as well as the administrative officer tried to accommodate her restrictions. (*See* App. pp. 79-81, 84-85, 223, 224, 229, 249, 251, 259). Under these working conditions, a reasonable person would not have felt compelled to resign. Additionally, before

17

resigning, a reasonable person would have completed the internal grievance process and considered the VA's mediation offer of adding more complex responsibilities to the GS-4 position for a different classification. (App. pp. 104, 225, 248); *See Boze*, 912 F.2d at 804.

Defendant has met his summary judgment burden, and the burden now shifts to Plaintiff to identify evidence in the record that supports a claim of constructive discharge. Plaintiff argues that she unwillingly left the VA because her supervisors failed to monitor her equipment situation, and because she experienced the emotional and physical distress of having to work without the appropriate equipment. (Resp. at 3-6). While this may be construed as an argument for constructive discharge, Plaintiff does not identify any evidence to show that her medical problems were related to her working conditions. *See Ragas*, 136 F.3d at 458. Additionally, her subjective state of mind is irrelevant to a determination of constructive discharge. *Robinson v. Waste Mgmt. of Tex.*, 125 F. A'ppx. 756, 758 (5th Cir. 2004). Plaintiff has failed to carry her burden and Defendant is entitled to summary judgment on any constructive discharge claim. *See Ragas*, 136 F.3d at 458.

## VI.  RESIGNATION UNDER DURESS

Even if Plaintiff's complaint can be construed to assert a claim for duress, Defendant argues that Plaintiff cannot prove she resigned under duress. (Mot. at 31).

Plaintiff must show that (1) she involuntarily accepted the terms of her resignation, (2) she had no other alternative but to resign under the circumstances, (3) and the circumstances were the result of her employer's coercive acts. *See Handy*, 118 F. App'x. at 855 (citing *U.S. v. Thompson*, 749 F.2d 189, 194 (5th Cir. 1984)). Defendant correctly points out that Plaintiff had another alternative besides retiring because she could have accepted the GS-4 position offered to her on

18

August 21, 2007. (Mot. at 31, citing 77, 99, 276). Additionally, Plaintiff does not allege and there is no evidence of coercive acts by the VA. Defendant has met his summary judgment burden. The burden now shifts to Plaintiff to provide evidence in the record showing duress. Because she failed to do so, Defendant is entitled to summary judgment on any claim that she resigned under duress. *See Ragas*, 136 F.3d at 458; *Celotex Corp.*, 477 U.S. at 322-23.

### VII.  DISABILITY-BASED HARASSMENT

Defendant also moves for summary judgment on any disability-based harassment claim that can be construed from Plaintiff's pleadings. (Mot. at 32).

An employee can bring a claim of harassment under the ADA, and by extension, the Rehabilitation Act. *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 234-35 (5th Cir. 2001). The employee must prove that (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment affected a term, condition or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Id.* at 235-36. "[T]he disability-based harassment must be sufficiently pervasive or severe to alter the conditions of employment and create an abusive work environment." *Id.* at 236.

Defendant points to Plaintiff's own admission during her deposition that no VA supervisor ever made a discriminatory statement to her to meet his summary judgment burden. (Mot. at 32, citing App. p. 102). Plaintiff does not dispute this evidence. Nor does she identify any evidence to establish the second element of any harassment claim, and Defendant is entitled to summary judgment. *See Ragas*, 136 F.3d at 458; *Celotex Corp.*, 477 U.S. at 322-23.

19

## VIII.  CONCLUSION

*Defendant's Motion for Summary Judgment* should be **GRANTED** as to all of Plaintiff's claims.

**SO RECOMMENDED** on this 5th day of April, 2010.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE